UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.  )<br>)<br>(3) KENNETH STROMSLAND, )<br>)<br>Defendant )<br>) | Criminal No. 18-10154-DPW |

# GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1

The government respectfully submits this sentencing memorandum and motion, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Sentencing Guidelines"), in connection with the sentencing of defendant Kenneth Stromsland.

Stromsland, an investor in and employee of co-defendant Frank Reynolds' biotech startup, PixarBio, engaged in manipulative trading of PixarBio shares in an effort to artificially inflate the share price. Later, Stromsland made false and misleading statements intended to obstruct the SEC's investigation into manipulative trading and other issues relating to PixarBio.

The government recommends that Stromsland be sentenced to a term of home detention of 6 months, followed by two years of supervised release, and required to pay a fine within the Sentencing Guidelines range.[1] As set forth below, the government's recommended sentence takes

---

[1] Stromsland should also be ordered to forfeit the $27,500 that he personally received as a "bonus" in exchange for his manipulative trading. In December 2018, the government filed a motion for an order of forfeiture consisting of a money judgment in the *incorrect* amount of $25,700 – which amount was also misstated in the plea agreement. *See* D.E. 85, 69, respectively. The Court entered the order of forfeiture, and Stromsland satisfied the money judgment by payment in full. *See* D.E. 86, 97, respectively. The government is filing an amended motion for an order of forfeiture in the correct amount of $27,500. Stromsland assents to the amended motion,

into account the defendant's substantial assistance in the government's investigation and prosecution of Reynolds, who directed Stromsland's manipulative trading and induced his obstruction of the SEC's investigation.

## I. Overview of the Offense Conduct

In December 2015, Stromsland, a long-time friend of Reynolds', joined PixarBio as Chief Information Officer ("CIO"). Approximately seven months later, Reynolds promoted Stromsland to Vice President, CIO & External Communications. Beginning in or about October 2016, Reynolds and Stromsland, along with co-defendant M. Jay Herod – also a close friend of Reynolds' and a PixarBio investor – engaged in a scheme to defraud investors in PixarBio by engaging in manipulative trading of the company's shares.[2] Stromsland and Herod, while in close communication with Reynolds and at times acting at Reynolds' direction, traded PixarBio shares in an effort to simulate market interest in the stock and artificially inflate the share price and trading volume.

On six days in November and December 2016, Stromsland purchased PixarBio shares to drive up the price of the stock. Prior to his first purchase on Friday, November 11, 2016, Reynolds – who had requested that Stromsland closely monitor and report back to him on the stock's performance – directed Stromsland to buy shares of PixarBio in an effort to keep the share price up over the weekend. After the publicly reported price of PixarBio stock fell from $14 to $10 per share on November 11, Stromsland made two 100-share purchase orders, each at $14.25 per share, the second of which was executed at approximately 3:55 p.m. and successfully affected the

---

agrees that $27,500 is the correct amount, and intends to promptly pay the difference upon the Court's issuance of an amended order.

[2] As noted in the Presentence Investigation Report ("PSR"), there is no evidence that Stromsland and Herod were involved in each other's manipulative trading. *See* PSR at 5 n.1.

publicly quoted price of PixarBio stock. After trading closed at 4:00 p.m. that day, with PixarBio's stock price closing at $14.50, Stromsland and Reynolds exchanged phone calls and, at approximately 4:40 p.m., Reynolds sent an email instructing PixarBio's Controller to give Stromsland a $27,500 "bonus." On several occasions thereafter, Stromsland again made small purchases of PixarBio stock to try to push up the price. For example, on November 17, 2016, at 3:56 p.m., after the price of PixarBio stock had again decreased to $10 per share, Stromsland bought 100 shares at $12.50 per share.

Beginning in or about January 2017, the SEC initiated an investigation into manipulative trading and other issues relating to PixarBio's stock. Reynolds, Stromsland, and Herod each testified before the SEC in connection with the investigation. In their sworn testimony, all three defendants made materially false and misleading statements intended to obstruct the SEC's investigation. In his three days of testimony, Reynolds falsely denied any knowledge of or involvement in Stromsland's and Herod's manipulative trading of PixarBio shares. Reynolds then induced Stromsland and Herod to corroborate his false testimony.

Specifically, on or about February 15, 2017, the day before Stromsland's first day of SEC testimony, Reynolds told Stromsland that in his own testimony a few weeks prior, he had testified that he had no knowledge of Stromsland's purchases of PixarBio shares, despite the fact that Reynolds not only knew about the trading but had directed and encouraged it. In his testimony the following day and again on April 27, 2017 and May 25, 2017, Stromsland falsely denied that he had traded PixarBio shares in an effort to affect the share price. He also falsely testified that Reynolds was not involved in nor aware of his trading.

3

## II. The Applicable Sentencing Guidelines

The parties have stipulated in the plea agreement that Stromsland's total offense level under the Sentencing Guidelines is 20. That calculation reflects a base offense level of 7 under Section 2B1.1(a)(1) because Stromsland was convicted of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a); a 10-level increase, pursuant to Section 2B1.1(b)(1)(F) and Application Note 3B, based on Stromsland's gain from the offense; a 4-level increase pursuant to Section 2B1.1(b)(20)(A)(i) because Stromsland was convicted of an offense that involved a violation of securities law and, at the time of the offense, he was an officer of a publicly traded company; a 2-level enhancement pursuant to Section 3C1.1 for Stromsland's obstruction; and a 3-level decrease pursuant to Section 3E1.1 for his acceptance of responsibility. The resulting Sentencing Guidelines imprisonment range is between 33 and 41 months.

Notwithstanding the parties' stipulation, the PSR concludes that there was no "profit/gain or loss" from the offense, and that Stromsland's base offense level under Section 2B1.1 should therefore not be enhanced for gain or loss. *See* PSR ¶ 23. The government respectfully disagrees with this conclusion.

In this case, the pecuniary loss from the offense is the loss to investors who purchased PixarBio shares on the public market at artificially inflated prices due to Stromsland's manipulative trading. However, because that amount "reasonably cannot be determined," the Court "shall use the gain that resulted from the offense as an alternative measure of loss." USSG § 2B1.1, Application Note 3(B). As stated in paragraph 72 of the PSR, the parties agree that the gain from the offense is approximately $163,728, which represents the $27,500 "bonus" Stromsland received in exchange for his manipulative trading on November 11, 2016, as well as the salary he was paid from the time he began his manipulative trading until the end of his

4

employment at PixarBio. Not only have the parties stipulated to this gain amount in the plea agreement, but the evidence presented at Reynolds' trial demonstrated that this was indeed the gain to Stromsland from his manipulative trading.

First, the documentary evidence and Stromsland's own testimony at Reynolds' trial made clear that Reynolds awarded Stromsland the $27,500 bonus on Friday, November 11, 2016 because Stromsland followed Reynolds' direction to buy shares of PixarBio in an effort to keep the stock price up over the weekend, and because Stromsland's manipulative trading successfully drove the share price up before the market closed that day. Second, Stromsland testified that he continued engaging in manipulative trading of PixarBio shares after November 11 because he knew that was what Reynolds – his boss – wanted and expected him to do. While it is true that Stromsland did not earn a profit from his manipulative trades themselves (*i.e.*, he did not sell the shares he purchased for a profit, *see* PSR ¶ 14), the $27,500 "bonus" is what he earned as a result of engaging in manipulative trading. So too was the salary he continued to earn from PixarBio, as Stromsland understood that if he did not do exactly what Reynolds wanted, he very likely may have lost his job.

To conclude otherwise would lead to the illogical result that in any manipulative trading scheme where the defendant is paid for his role in the scheme and thereby realizes a personal pecuniary gain as a result of his offense but does not realize profits from the trades themselves, there is no gain. Other courts have found that in similar circumstances, the gain is – or at least includes – fees, commissions, or other similar payments the defendant received from engaging in manipulative trading. *See United States v. Offill*, 666 F.3d 168, 179–80 (4th Cir. 2011) (holding, in a case involving a pump-and-dump scheme, that the district court properly found that the defendant's gain from the offense included not only the amount that the conspiracy as a whole

5

gained from dumping the pumped-up shares, but also the compensation the defendant received for orchestrating 51 stock issuances, the shares from some of which were then transferred to co-conspirators to be used in the pump and dump); *United States v. Landis*, No. 18-CR-10443-IT (D. Mass.), Dkt. 48 (Tr. of Hrg.) at 48–78 (Talwani, J.) (finding that the defendant's gain from engaging in manipulative trading in an effort to generate the false appearance of volume was the amount he was paid by third-party stock promoters to participate in the scheme minus the amount of his trading losses).[3]

Just as in *Landis*, where the goal of the defendant's crime was not to make money trading but to generate volume and thereby successfully promote the stock (and get paid for doing so), here, the goal of Stromsland's manipulative trading was not to make money from his trades on the public stock market but to drive up the price of PixarBio's stock, to keep Reynolds happy and to keep his job. If Stromsland had not engaged in his crime of manipulative trading, he certainly would not have gained the $27,500 because Reynolds would not have caused PixarBio to pay him that money, and he probably would not have continued to gain his salary because, as Stromsland himself feared, Reynolds likely would have fired him, as he did with others who refused to go along with his fraudulent scheme. *See United States v. Shabudin*, 701 F. App'x 599, 601 (9th Cir. 2017) (affirming the district court's use of the defendant's salary as a proxy for loss where the district court had found that the defendant's salary represented a gain resulting from his fraud offenses because he "would not have received [that salary] but for his unlawful conduct").[4]

---

[3] A copy of the *Landis* transcript is attached hereto as <u>Exhibit A</u>.

[4] If the Court were to find that Stromsland's gain from the offense was only $27,500, the adjusted offense level under Section 2B1.1 would be 17, which is equal to the adjusted offense level for obstruction of justice under Section 2J1.2, which Probation found to be the determinative calculation. This would therefore result, under either Guidelines Section, in a total offense level of 14 and a Guidelines imprisonment range of 15 to 21 months.

### III. Sentencing Recommendation and Motion Pursuant to Section 5K1.1

While the parties have stipulated that Stromsland's advisory Sentencing Guidelines range is between 33 and 41 months, the government does not believe that proportional and just punishment requires a sentence within the Guidelines range, insofar as the defendant promptly accepted responsibility for his criminal conduct, appears genuinely remorseful, and is unlikely to reoffend. Moreover, the government submits that a downward departure, pursuant to Section 5K1.1 of the Guidelines, is appropriate to reflect Stromsland's substantial assistance in the government's investigation and prosecution of Reynolds.

Notably, promptly after his arrest on a complaint, and without having reviewed the government's evidence against him, Stromsland met with the government in a proffer session in which he described his own involvement, and that of Reynolds, in the manipulative trading scheme and the obstruction of the SEC's investigation. Stromsland truthfully described his conduct and that of Reynolds in detail – including the fact that his trading was intended to artificially inflate the stock price and that Reynolds directed both his trading and his false SEC testimony. The information Stromsland provided offered a vivid, first-person account of the scheme, which the government was able to corroborate with other evidence. The government believes that Stromsland's willingness to testify truthfully about the scheme was a significant factor in Herod's ultimate decision to plead guilty, and to cooperate with the government's investigation. In addition, Stromsland testified over the course of three days at Reynolds' trial. In the government's view, he was both forthright and contrite on the witness stand, and his testimony was crucial in securing Reynolds' conviction.

Nonetheless, Stromsland's crimes were serious. His manipulative trading was a fraud on the market, pumping up the value of a stock that – as a result of Reynolds' separate conduct – was

ultimately worthless. Manipulative trading schemes like this one undermine the integrity of and confidence in public markets that many in society increasingly view as rigged by insiders. Thus, when someone in Stromsland's position – an officer of a publicly traded company – engages in such criminality it is particularly troubling. On the other hand, the government acknowledges that Stromsland was an officer of PixarBio in name only, in reality acting as a glorified administrative assistant to Reynolds. Further, Stromsland is readily distinguishable from an experienced trader carrying out a sophisticated market manipulation scheme over a prolonged period of time. He clumsily made a limited number of trades on a few occasions at Reynolds' direction, not to make money but to keep Reynolds, the clear mastermind of the scheme, satisfied that PixarBio stock was performing as he hoped.[5]

However, Stromsland then went into the SEC on three separate occasions and lied repeatedly under oath about his manipulative trading, claiming that his purchases of PixarBio shares were not intended to affect the publicly reported stock price and denying any involvement on the part of Reynolds. Stromsland's obstruction warrants a more serious sentence than if his crimes were limited to securities fraud alone. But this crime too was committed at Reynolds' direction, and was meant to protect Reynolds, as Stromsland unquestionably would have been better off had he told the SEC the truth – as he might have done had he been represented by counsel whose primary loyalty was to him and not to Reynolds. Stromsland is a man who has proven himself highly susceptible to crossing the line at the behest of others, but he is also a man who,

---

[5] Of course, Stromsland stood to gain from PixarBio's stock performing well, as he had invested in the company's private offerings. Indeed, Stromsland testified at Reynolds' trial that part of his motivation in getting involved with PixarBio was Reynolds' assurance that it was going to make him a millionaire.

8

when faced with his criminality, accepted full responsibility, demonstrated remorse, and is unlikely to cross that line again.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of home detention of 6 months, followed by two years of supervised release.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Leslie A. Wright*
LESLIE A. WRIGHT
SARA MIRON BLOOM
Assistant United States Attorneys

Date: February 20, 2020

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated: February 20, 2020        By: */s/ Leslie A. Wright*
                                    LESLIE A. WRIGHT
                                    Assistant United States Attorney

9