UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
    v.

M. JAY HEROD,

    Defendant

No. 18-CR-10154-DPW

GOVERNMENT'S SENTENCING MEMORANDUM AND
MOTION PURSUANT TO USSG 5K1.1

The United States respectfully submits this memorandum in support of its sentencing recommendation for the Defendant M. Jay Herod ("Herod") of incarceration for sixteen months, supervised release for two years, a fine within the Sentencing Guidelines range, a special assessment of $200, and forfeiture and restitution in the amount of $120,000.

On February 7, 2019, Herod pleaded guilty to counts one and two of a superseding information charging him with securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff(a) and 17 C.F.R. § 240.10b-5, and obstruction of an agency proceeding in violation of 18 U.S.C. § 1505, respectively.  In connection with his guilty plea, Herod admitted to committing securities fraud by market manipulation and to obstructing the SEC's investigation into that fraud by testifying falsely before the SEC on February 8, 2017 and by providing a back-dated agreement to the SEC.  Herod entered into a cooperation agreement with the government and testified at co-defendant Francis M. Reynolds' trial in October 2019.

I.   **GOVERNMENT'S STATEMENT OF OFFENSE CONDUCT**

The conduct which is the basis for the offenses of conviction includes the following:

A.   **Background**

Reynolds was the President, Chief Executive Officer, Chief Financial Officer, Chief Science Officer, and Chair of the Board of Directors of PixarBio, a company headquartered for a time in Medford, Massachusetts. PixarBio was a biotech startup which purported to be developing "NeuroRelease," a method of delivering carbamazepine, a non-opioid painkiller, to treat post-operative pain and other conditions.

Herod was a close friend of Reynolds' and an investor in PixarBio. Co-defendant Kenneth Stromsland was also a friend of Reynolds' and an investor in PixarBio, in addition to being an employee of the company.

Between October 31, 2016 – after PixarBio acquired a publicly traded company, BMP Holdings, Inc., in a transaction known as a "reverse merger" – and January 23, 2017, PixarBio's shares traded publicly on OTC Link, an over-the-counter securities market, under the ticker symbol PXRB. In connection with that reverse-merger, Reynolds arranged for Herod to receive the majority of the publicly traded shares of PXRB (130,000 shares) for $2,600. Reynolds also then implemented a stock split that converted these 130,000 shares into 1.3 million shares.

B.   **Count One: Securities Fraud**

Beginning in or about October 2016, Reynolds, Herod, and Stromsland engaged in a scheme to defraud investors in PixarBio by engaging in manipulative trading of PixarBio shares. Stromsland and Herod, while in close communication with Reynolds and at times acting at Reynolds' direction, traded PixarBio shares in an effort to simulate market interest in the stock and artificially inflate the share price and trading volume.

Though his trading, Herod both sought to liquidate some of the millions of shares Reynolds had arranged for Herod to acquire for $2,600, or less than a penny per share. At times, at the suggestion of Reynolds, Herod also sought to keep the price of the stock up and create an appearance of trading volume. He first sold large volumes of shares at slightly higher incremental prices to drive the price up. Later, he repeatedly bought small amounts of PixarBio stock to try to push the price up, while selling larger amounts to try to liquidate some of his shares and make a profit. Between October 31, 2016 and January 23, 2017, Herod sold 211,901 shares of PixarBio stock and bought 6,618 shares, earning approximately $920,000 on his sales. He directed $500,000 of the trading proceeds to PixarBio and $300,000 to Reynolds' spouse for the benefit of Reynolds, and kept the remaining approximately $120,000 in proceeds for himself.

### C.     Count Two: Obstruction of the SEC Proceeding

Between January 2017 and September 2017, as part of an investigation into manipulative trading and other issues in connection with PixarBio's stock, the SEC served Reynolds, Herod, Stromsland, and PixarBio with subpoenas requiring them to produce documents and to testify before the SEC. In his three days of sworn testimony, Reynolds falsely denied any knowledge of or involvement in Herod's and Stromsland's manipulative trading in PixarBio shares. In his testimony before the SEC on February 8, 2017, Herod corroborated Reynolds' testimony, falsely denying that his trading of PixarBio shares was intended to influence the price and volume of the stock. Herod also falsely testified that he had not discussed that strategy with Reynolds.

In addition, Herod signed and provided to the SEC a purported investment agreement among Herod, Reynolds, and Reynolds' spouse that was back-dated to December 29, 2016 to make it appear as though it had been executed before the start of the SEC's investigation (the "Back-Dated Agreement"). The purported agreement provided that Herod had given $300,000 to

Reynolds (via a check to Reynolds' wife) in exchange for a ten percent interest in Reynolds' future recovery from a litigation settlement. In fact, Reynolds created the Back-Dated Agreement as a cover story for his receipt of $300,000 of Herod's trading proceeds. In his testimony on February 8, 2017, Herod sought to mislead the SEC by claiming that he had signed the written agreement a week or so after the date of the $300,000 check (December 28, 2016). In fact, as Herod knew, the agreement was prepared on January 27, 2017, the day after Reynolds' first day of SEC testimony.

### D.     Other Potentially Relevant Conduct

On July 3, 2019, the FBI received an online tip from an individual named Maria Vega, who alleged insider trading by her husband, David Kazis. The tip alleged that Kazis, who was reportedly a good friend of Herod's and Reynolds' and held stock in Reynolds' former company, InVivo, traded that stock based on information provided by Herod. Specifically, the complainant stated that in 2013, when Reynolds was terminated from InVivo, and before his termination/resignation was made public, Herod told Kazis to sell his InVivo stock. Kazis reportedly did so and made a lot of money as a result. The tip included additional information regarding Kazis' investment in PixarBio, reported harassment of Kazis by Reynolds related to Kazis' trading in InVivo stock, and Kazis' resulting disinclination to testify as a witness at Reynolds' trial.

The Court ordered a mid-trial deposition of Herod to address this issue, about which the government had not questioned Herod prior to his testimony. In that deposition, Herod candidly admitted to sharing with Kazis non-public information related to InVivo (which Herod received from Reynolds), including that Reynolds was "having trouble" with the InVivo Board of Directors and "[i]t looked like [Reynolds] was going to be let go." Herod further acknowledged that he knew it was possible Kazis might trade on that information. Kazis later told Herod that he had sold his InVivo stock after receiving the information and before it became public. Herod stated in the

deposition that he later joked around with Kazis about this, telling Kazis, "you actually engaged in insider trading." He then also admitted to this conduct at trial as well.

## II. GOVERNMENT'S SENTENCING GUIDELINES CALCULATION

The government submits that because the loss attributable to Herod's manipulative trading cannot reasonably be determined, the gain that resulted from the offense should be used as an alternative measure of loss. As stated above, even though he did not ultimately keep most of these profits, Herod earned approximately $920,000 on his sales of PixarBio shares. On that basis, the government takes the position that Herod's offense level should be increased by 14 because his gain from the offense was more than $550,000 but not more than $1,500,000.[1] Accordingly, the government has calculated the sentencing guidelines as follows:

| Base offense level (§ 2B1.1(a)(1)) | 7 |
| --- | --- |
| Loss (§ 2B1.1(b)(1)(H)) | +14 |
| Obstruction (§ 3C1.1) | +2 |
| Acceptance of responsibility (§ 3E1.1) | –3 |
| Total offense level | 20 (33–41 months) |

## III. MOTION PURSUANT TO USSG § 5K1.1 BASED UPON HEROD'S COOPERATION

The United States submits that Herod provided substantial assistance in the prosecution of Reynolds, and on that basis is recommending a below-Guidelines sentence of 16 months of incarceration. As the Court observed, Herod testified as a witness for the United States at Reynolds' trial. The jury ultimately must have credited Herod's testimony to some degree when

---

[1] Herod has reserved the right to argue that his offense level should be increased by 12 instead of 14.

it found Reynolds guilty on Count Four, for causing Herod to obstruct the SEC's investigation. The jury's verdict finding Reynolds guilty of securities fraud by manipulative trading also suggests that they credited both Stromsland's and Herod's testimony that their manipulative trading was caused by Reynolds and done at his urging.

Accordingly, the United States submits that Herod is appropriately afforded a significant departure from his Guidelines range based upon his cooperation and substantial assistance.

## CONCLUSION

Herod, at the behest of his friend, and to make money, engaged in significant market manipulation and then obstructed the SEC's investigation of that manipulation, including by signing and providing a false document. Although he acted very much as the puppet of the very dominant Reynolds, Herod demonstrated a willingness to go along with criminal conduct that was necessary for Reynolds to successfully execute his scheme. He has now, however, accepted responsibility and pleaded guilty. He testified about his role and that of Reynolds and thereby assisted in providing evidence from which the jury convicted Reynolds, who was clearly the mastermind and driving force behind the scheme. The United States submits that a sentence of sixteen months is sufficient but not greater than necessary to meet the goals of sentencing here.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  /s/ *Sara Miron Bloom*
SARA MIRON BLOOM
LESLIE WRIGHT
Assistant United States Attorneys
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Dated: February 14, 2020            (617) 748-3265

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                      /s/ *Sara Miron Bloom*
                                      Sara Miron Bloom
                                      Assistant United States Attorney

Date: February 14, 2020